1

2

3

4  UNITED STATES DISTRICT COURT

5  DISTRICT OF NEVADA

6  * * *

7  SANDRA K. KRAUSE,                                   Case No. 2:12-CV-342 JCM (CWH)

8                                    Plaintiff(s),                     ORDER

9          v.

10  NEVADA MUTUAL INSURANCE
    CPOMPANY,,
11
                                     Defendant(s).
12

13

14          Presently before the court is a renewed motion for summary judgment submitted by

15  defendants Nevada Mutual Insurance Company (hereinafter "NMIC") and Trean Corporation

16  (hereinafter "Trean"). (Doc. # 197). Plaintiff Sandra Krause filed a response, (doc. # 205), and

17  defendants filed a reply, (doc. # 214).

           Also before the court is a partial motion for summary judgment submitted by Krause.
18
    (Doc. # 200). Defendants filed a response, (doc. # 216), and Krause filed a reply, (doc. # 221).
19
           Finally before the court is defendants' motion for leave to supplement the record. (Doc. #
20
    241). Krause filed a response, (doc. # 245), and defendants filed a reply, (doc. # 247).
21

22  **I.      Background**

23          This case arises out of Krause's employment at Trean. Trean, a Minnesota corporation,

24  provides management and consulting services to insurance companies. One such company was

25  NMIC, a Nevada corporation that maintains a contractual agreement with Trean. Under this

26  agreement, Trean provides NMIC professional services, including insurance reporting, claims

27  administration, and underwriting functions.

28

**James C. Mahan**
**U.S. District Judge**

Trean and NMIC share several of the same corporate officers and directors. Andrew O'Brien is the president of both companies. Patricia Schaffran, plaintiff's former supervisor, is a senior vice president at Trean and serves as its chief financial officer and human resources manager. Schaffran is also the corporate secretary and treasurer for NMIC.

Trean hired plaintiff as its vice president of claims in May 2007. Plaintiff performed claims administration for NMIC, working out of the company's office in Las Vegas, Nevada. She performed similar services for Benchmark, a subsidiary of Trean. Her initial base salary was $110,000. Plaintiff qualified for standard benefits, such as medical and retirement, and was afforded additional benefits not offered to any other vice president, including assistance with her mortgage and car insurance. She received raises and bonuses throughout her tenure.

During 2008, Charles Wallace, an NMIC founder who worked in the same Las Vegas office as plaintiff, began engaging in conduct that plaintiff found offensive. Robert McBride, an attorney providing defense work to NMIC's clients, sent messages containing pornography to Wallace's work email and to friends outside of NMIC. Plaintiff never received these emails. In August 2008, NMIC assigned plaintiff to review discovery materials for a suit between NMIC and McBride's firm over a billing dispute. During her review, she noticed the exchange of pornography. As a result of the emails, NMIC removed McBride from its panel of defense attorneys.

Shortly thereafter, plaintiff and O'Brien discussed the pornography exchange at a meeting, where O'Brien made a comment about pornography being "not that bad." Plaintiff expressed concern to Schaffran about both the emails and O'Brien's comment, (Doc. # 206-4 p. 9), but neither plaintiff nor Schaffran filed a formal written complaint.

The next incident occurred in October 2008, during a risk management seminar that NMIC hosted for doctors. Plaintiff gave a presentation regarding agitated patients under the influence of drugs or alcohol, advising doctors not to touch such patients. After the presentation, Wallace joked to the attendees about plaintiff's advice. "If you see me out sometime in that state and condition . . . you can touch me." (Doc. # 207-5 p. 346). Plaintiff complained to Wallace directly about his comment and then reported it to Schaffran.

James C. Mahan
U.S. District Judge

- 2 -

1    Finally, in November 2008, Trean instituted mandatory sensitivity training, which included

2    Wallace. Plaintiff alleges that he made inappropriate comments during this training.

3    Plaintiff claims that, following her complaints about Wallace's conduct, the company

4    retaliated against her. First, plaintiff alleges retaliation because in May 2009 defendants sent out

5    customer satisfaction surveys to doctors regarding their interaction with the claims department.

6    Plaintiff asserts retaliation because surveys were sent regarding only the claims department. The

7    staff earned positive reviews, and customers specifically complimented plaintiff's work. Trean

8    also sent out surveys in 2010, receiving similar responses.

9    Next, plaintiff alleges retaliation because sometime in 2010, Trean had one of its vice

10   presidents, Steven Novak, conduct an audit of subsidiary Benchmark's claims department, which

11   plaintiff oversaw. Plaintiff asserts the audit was retaliatory because (1) it was her responsibility to

12   arrange for such audits, (2) it was planned without her knowledge, and (3) she believed Novak was

13   unqualified to perform the audit.

14   Finally, plaintiff alleges retaliation because O'Brien cancelled a meeting with her and never

15   rescheduled or followed up to see what she wanted to discuss. In August 2010, plaintiff scheduled

16   a meeting with O'Brien, who lives in Minnesota but was visiting Las Vegas for a hearing. Plaintiff

17   sought to discuss her workplace concerns regarding differential treatment of female employees

18   and the aforementioned "retaliatory" events. O'Brien was unable to make the meeting, and had

19   Schaffran inform plaintiff of the cancellation. Plaintiff never attempted to reschedule the meeting

20   and did not follow up further with O'Brien.

21   Plaintiff resigned her position on December 9, 2010, effective January 16, 2011. However,

22   she entered into an independent consulting arrangement with Trean to assist in transitioning the

23   claims in her department, which lasted a few months. Plaintiff subsequently filed a charge of

24   discrimination and retaliation with the EEOC against Trean and brought suit.

25   Plaintiff initiated this suit on December 21, 2011 in the Eighth Judicial District of Nevada.

26   (Doc. # 1-1). Plaintiff alleged (1) gender-based discrimination in violation of Title VII; (2) gender-

27   based discrimination in violation of state law; (3) retaliation in violation of Title VII, (4) intentional

28   infliction of emotional distress; (5) constructive discharge; (6) negligent hiring, supervision and

**James C. Mahan**
**U.S. District Judge**

- 3 -

1    retention; (7) tortious interference with an employment relationship; and (8) breach of the covenant

2    of good faith and fair dealing. (Doc. # 1-1).

3         Defendants petitioned for removal to this court on March 1, 2012. (Doc. # 1). Defendants

4    then filed a motion to dismiss. (Doc. # 5). This court granted defendants' motion on counts four

5    through eight. (Doc # 31). Three claims remain: (1) gender discrimination under 42 § U.S.C. 2000e

6    *et seq.* (Title VII); (2) gender discrimination under N.R.S. 613.310 *et seq.*; (3) and retaliation under

7    both aforementioned discrimination statutes. (Doc # 1-1).[1]

8         Defendants now move for summary judgment on all claims. (Doc. # 197). Plaintiff moves

9    for partial summary judgment on her gender discrimination claims. (Doc. # 200).

10        After defendants and plaintiff fully briefed their respective motions for summary judgment,

11   plaintiff discovered evidence that Trean did not include one of its former vice presidents, Ryan

12   Saul, on the compensation chart that it provided to plaintiff during discovery. The chart from Trean

13   contained comprehensive compensation information for the assistant vice presidents and vice

14   presidents that Trean employed from 2008 through 2011, the time period that Trean employed

15   plaintiff. However, the chart did not list Saul as a vice president or make any reference to his

16   employment at Trean.

17        Plaintiff filed a motion to supplement the summary judgment record with newly discovered

18   evidence related to Saul's employment. (Doc. # 235). Plaintiff sought to admit two new exhibits:

19   (1) a press release by Trean, which publicly announced the hiring of vice presidents Steve Novak

20   and Ryan Saul, and senior vice president Sean Ryan; and (2) a printout of Saul's LinkedIn page,

21   which indicated that Trean had employed him from February-March 2009. (Doc. # 235 at 7).

22   Plaintiff asserted that these exhibits would bring necessary light to her gender-based pay

23   discrimination claim. Defendants indicated that they did not oppose the motion. The court granted

24   plaintiff's motion on March 27, 2015. (Doc. # 242).

25

26

27        [1] Both parties also refer to Krause's constructive discharge claim throughout their motions.
     (*E.g.*, doc. # 197 p. 18; doc # 205 p. 3). However, this court dismissed Krause's constructive
28   discharge claim in its order granting in part defendants' motion to dismiss. (Doc. # 31). The court
     will therefore not further address this claim.

James C. Mahan
U.S. District Judge

Defendants filed their own motion to supplement the record. Defendants assert that Trean inadvertently excluded Saul from the compensation chart. Defendants assert that they became aware of Trean's inadvertent exclusion of Saul only when plaintiff filed her motion to supplement the record. (Doc. # 241 at 3). Defendants assert that, upon receiving plaintiff's motion to supplement the record, they offered to stipulate to reopen discovery relating to Saul and plaintiff's motions for leave in an effort to provide both plaintiff and the court with all relevant information on those issues. (*Id.* at 4). Defendants further assert that plaintiff declined their offer to stipulate to reopen discovery, prompting defendants to file the instant motion to supplement the record. (*Id.*). Therefore, defendants ask that they be allowed to supplement their disclosures to plaintiff.

The court will address defendants' motion to supplement the record first, as the court's determination of whether to allow defendants to supplement affects the evidentiary record this court may consider in evaluating the parties' motions for summary judgment.

**II.    Legal Standards**

**A.  Rule 26(a) disclosures**

Rule 26(a)(1)(A) provides that parties must provide initial disclosures to the opposing parties without awaiting a discovery request. The disclosures must include: (i) the name of each individual likely to have discoverable information that the disclosing party may use to support its claims and defenses; (ii) a copy of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses; and (iii) a computation of each category of damages claimed by the disclosing party. *See* Fed. R. Civ. P. 26(a)(1). In the event that a party learns that its disclosures are incomplete or inaccurate, it has a duty to supplement them "in a timely manner." *See* Fed. R. Civ. P. 26(e).

When a party fails to meet its initial disclosure obligations, the court turns to Rule 37(c) to determine whether sanctions are appropriate. Rule 37(c)(1) provides that a non-compliant party is "not allowed to use the information or witness to supply evidence on a motion . . . unless the failure was substantially justified or harmless." The party facing the sanction has the burden of showing substantial justification or harmlessness. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106–07 (9th Cir.2001). Even where nondisclosure was neither harmless nor justified,

James C. Mahan
U.S. District Judge

- 5 -

however, the court is not required in all instances to exclude evidence as a sanction. *Jackson v. United Artists Theatre Circuit, Inc.*, 278 F.R.D. 586, 594 (D. Nev. 2011). Rule 37(c)(1) also enumerates a number of other potential sanctions, including payment of reasonable expenses incurred, an order that the movant may inform the jury of the opposing party's failure, and any other "appropriate" sanction, including those listed in Rule 37(b)(2)(A)(i)-(vi).

The court has wide discretion in determining the appropriate sanction. *See Yeti,* 259 F.3d at 1106. In determining the appropriate sanction, the court looks to five factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *See Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997). Moreover, where evidence exclusion "amount[s] to dismissal of a claim, the district court [is] required to consider whether the noncompliance involved willfulness, fault, or bad faith." *R & R Sails, Inc. v. Ins. Co. of Penn.,* 673 F.3d 1240, 1247 (9th Cir. 2012).

## B. Summary judgment

The Federal Rules of Civil Procedure provide for summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential

**James C. Mahan**
**U.S. District Judge**

- 6 -

element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III.   Discussion

### A.   Defendants' motion to supplement the record

A party who fails to disclose materials can potentially cure its failure to disclose if it proves that the error was substantially justified or harmless. *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d

**James C. Mahan**
**U.S. District Judge**

1240, 1246 (9th Cir. 2012) ("The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless.").

Defendants seek to supplement their incomplete Rule 26 disclosures based on plaintiff's discovery of Saul's employment. The actions at issue here are not harmless. Therefore, defendants face the burden of establishing that Trean's failure to disclose was substantially justified under Rule 37(c).

Defendants produced a compensation chart for plaintiff on April 23, 2013, which included information about thirteen individuals who had all been employed as either vice presidents or assistant vice presidents at Trean between 2008 and 2011. The chart included each person's annual salary and bonuses, actual amounts paid in salaries or bonuses for each given year, and detailed information about each employee's 401k contributions, dental and medical insurance benefits, HSA contributions, life and disability insurance benefits, and long term care benefits. (Doc. # 90, exh. AA). Despite having served as a vice president at Trean in 2009, Saul's name did not appear within this chart.

Defendants assert that their omission of Saul from the compensation chart was an inadvertent mistake and not an effort to intentionally withhold evidence. Defendants assert that Trean undertook a thorough review of employee records to prepare a comprehensive compensation chart for discovery. Defendants assert that, because Trean employed Saul for a mere five weeks in 2009, Saul's employment essentially slipped through the cracks. Plaintiff responds that Trean should not be allowed to correct its inaccurate disclosures with evidence it withheld for two years. (Doc. # 245).

Defendants detail Trean's process in compiling the compensation chart. (*See* doc. # 241). The employees responsible for compiling information for the compensation chart—Jill Johnson and Kathy Hartley—began their process by reviewing Trean's organization charts for years 2008 through 2011. Hartley then cross-referenced the names of the assistant vice presidents and vice presidents from the organization chart with a list of employees on Paychex payroll software to see if she missed anyone who should be included.

James C. Mahan
U.S. District Judge

- 8 -

1          Saul's name did not appear on any of the organization charges Hartley reviewed. It was

2 Trean's practice to update these charts on or around the end of the year, not at each time the

3 company hired a new employee. Because Trean employed Saul only from February 17, 2009

4 through March 23, 2009, he was not included in the 2009 Trean organization chart. Further, when

5 Hartley cross-checked names against the Paychex system, Saul's name did not appear. The

6 Paychex printout Harley used included only employees of Trean at the time she ran the report.

7 Since Hartley's review occurred in 2013, four years after Saul's brief employment, this measure

8 did not produce Saul's name.

9          Hartley then referred back to the Paychex system to gather more information about the

10 employees she identified. She reviewed the individual employee Paychex profiles to identify each

11 employee's date of hire and, if applicable, the date each employee left Trean. Hartley then pulled

12 information from Paychex for each vice president and assistant vice president that she had

13 identified regarding their (1) total compensation for each given year and, (2) 401K contributions.

14 Since Hartley had not identified Saul during her previous searches, she did not list any of this

15 information about Saul in the compensation chart.

16          Hartley also referred to a spreadsheet detailing employee pay-raise information that she

17 personally gathered and consistently revisedsince 2009. However, it was Hartley's practice to

18 remove from the spreadsheet any employees who left the company so that the chart tracked only

19 the pay raise history of current employees. Hartley used this spreadsheet to double check her

20 calculations of the annualized salaries of the assistant vice presidents and vice presidents still

21 employed by Trean at the time of her review in 2013. Since Saul left Trean in 2009, Saul's name

22 did not appear on the spreadsheet.

23          Hartley then reviewed and added employee benefit information to the chart. She reviewed

24 a spreadsheet generated by Trean's 401K program vendor, Securian, and monthly invoices which

25 listed the benefits Trean employees received each month from Trean's medical, dental, life, and

26 disability insurance. Hartley calculated the yearly sum of benefits received by each individual vice

27 president and assistant vice president she identified. Saul, again, did not appear in either of these

28

James C. Mahan
U.S. District Judge

1    reviews because Trean employed him for less than one full fiscal quarter and, accordingly, he was

2    not eligible for benefits.

3        Hartley estimates that she spent 25 to 30 hours reviewing and compiling employee

4    information for the compensation chart. She asserts that she did not remember that Saul worked

5    for the company, since Trean employed him for only five weeks, four years earlier.

6        After completing the compensation chart, Hartley sent it to Johnson for review. Johnson

7    reviewed the chart, checked the calculations, and determined that the chart was complete and

8    accurate. Despite having general familiarity with Trean's employees and managers, and having

9    been employed at Trean during Saul's brief tenure in 2009, Johnson also did not realize that Saul's

10   name had been inadvertently excluded. Johnson asserts that she does not remember interacting

11   with Saul during his tenure.

12       Further, neither Andrew O'Brien nor Patricia Schaffran, Trean's CEO and CFO,

13   respectively, realized Saul had been inadvertently omitted from the compensation chart until

14   plaintiff filed her motions for leave. Neither O'Brien nor Schaffran recalled Saul's employment

15   until plaintiff filed her motions for leave to file supplemental evidence regarding Saul's

16   employment. (Docs. ## 234, 235).

17       Trean conducted a thorough and comprehensive review of numerous sources in an attempt

18   to identify every relevant vice president and assistant vice president for discovery. Trean reviewed

19   organization charts, Paychex reports, pay raise charts, and 401k documents. Unfortunately, due to

20   the very short term of Saul's employment—approximately five weeks—Saul's name and

21   information were not contained on the sources used to identify the relevant employees.

22       Based on defendants' description of Trean's thorough process, extensive explanation ofthe

23   how and why this process failed to identify Saul, and immediate action to attempt to rectify Trean's

24   error, the court finds defendants' omission is substantially justified under Rule 37(c). Defendants'

25   request to supplement the record with information regarding Saul's employment and compensation

26   will be granted.

27       Defendants also request the opportunity for plaintiff to file a response to defendants'

28   supplemental filings, and for defendants to file a reply. The court finds that the supplemental

**James C. Mahan**
**U.S. District Judge**

1    evidence regarding Ryan Saul's base pay and benefit structure negates any need for the parties to

2    file additional briefings explaining their positions. Therefore, the court will review all declarations

3    and exhibits attached to (doc. # 241), except exhibits 8 and 9 of the Brimmer declaration, (docs.

4    ## 241-5, 241-6).[2] Accordingly, the court will now consider the parties' pending motions for

5    summary judgment.[3]

6        **B.  Defendants' and plaintiff's motions for summary judgment**

7            Plaintiff clarified in her motion for partial summary judgment, as well as other court filings,

8    that claims one and two in her complaint relate to gender-based pay discrimination. (*See, e.g.*,

9    docs. ## 125, 200, 205). Claim three alleges a hostile work environment based on retaliation for

10   engaging in a protected activity. (*See* docs. ## 125, 205).

11           **1.  Gender-based pay discrimination**

12           Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate

13   against any individual with respect to his compensation, terms, conditions, or privileges of

14   employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.

15   § 2000e-2(a)(1). "Nevada Revised Statutes § 613.330(1)(a) makes the same conduct unlawful

16   under state law." *Wilson v. Greater Las Vegas Ass'n of Realtors*, No. 2:14-CV-00362-APG-NJK,

17   2015 WL 1014365 at *4 (D. Nev. Mar. 9, 2015); *Cohen-Breen v. Gray Television Grp., Inc*., 661

18   F. Supp. 2d 1158, 1165 n.2 (D. Nev. 2009). The court will address claims one and two together,

19   referring only to Title VII.

20           To prevail on a pay discrimination claim under Title VII, a plaintiff must show that: (1)

21   she belongs to a protected class; (2) she was qualified for her position; (3) she was subject to an

22   adverse employment action; and (4) similarly situated individuals outside her protected class were

23

24   _____

25           [2] Exhibit 8 is a proposed supplemental brief in support of defendants' motion for summary
     judgment, (doc. # 197). Exhibit 9 is a proposed supplemental brief in support of
26   defendants' response, (doc. # 216) to plaintiff's motion for partial summary judgment, (doc. # 200).
     Because the court will not consider defendants' supplemental briefing, the court finds no reason
27   to grant plaintiff the opportunity to respond to these briefings.

28           [3] The court notes that the supplemental evidence allowed by this order is relevant only to
     plaintiff's claim for gender-based pay discrimination.

James C. Mahan
U.S. District Judge

1    treated more favorably in wage determinations. *See McDonnell Douglas Corp. v. Green*, 411 U.S.

2    792, 802 (1973).

3           When a party alleges pay discrimination under Title VII, plaintiff bears the initial burden

4    of establishing a prima facie case of discrimination. *Id.* at 802. Defendants do not dispute that

5    plaintiff is a member of a protected class and was qualified for her position. The court will thus

6    analyze whether she suffered an adverse employment action that was not imposed on similarly

7    situated employees outside her protected class.

8           Plaintiff argues that she earned less than two male vice presidents, Steven Novak and Ryan

9    Saul. Saul worked at the company for five weeks, during which time his base salary was $10,000

10   higher than plaintiff's salary of $125,000. (Doc. # 241-11). Both qualified for Trean's standard

11   benefits package. (*Id.*). However, Saul did not qualify for any of the "special benefits" received by

12   plaintiff in 2009, totaling $17,775.79.[4] (*Id.*). Saul's annualized compensation was lower than

13   plaintiff's, which does not support plaintiff's claim that she suffered an adverse employment

14   action.

15          Plaintiff's argument supporting an adverse employment action thus centers on a wage

16   comparison between her and Novak. Defendants do not dispute that Novak earned more than

17   plaintiff in total compensation. However, defendants assert that plaintiff and Novak were not

18   similarly situated because the two employees had distinctly different responsibilities in their

19   respective roles at Trean.

20          To succeed on a Title VII claim, plaintiff must offer evidence that similarly situated

21   individuals outside her protected class received more favorable treatment. *McDonnell Douglas*,

22   411 U.S. 792 at 802; *Bowden v. Potter*, 208 F. Supp. 2d 1108, 1114-15 (N.D. Cal. 2004). "[T]he

23   question of similarly situated is generally an issue of fact." *Bowden*, 208 F. Supp. 2d at 1117.

24   However, plaintiff must provide evidence to establish a triable issue of fact for a jury. *Id.*

25          "Individuals are similarly situated when they have similar jobs and display similar

26   conduct." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th. Cir. 2010) (quoting *Vasquez*

27

28          [4] "Special benefits" included assistance with her mortgage, car insurance, and dog boarding payments, among other benefits. (Doc. # 241-4 ¶¶ 10, 11). No other vice president received these or similar benefits during plaintiff's employment at Trean. (*Id.*).

James C. Mahan
U.S. District Judge

*v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003)). Courts do not require that compared employees be identically situated, but they must be similarly situated in all material respects. *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006); *see Bowden*, 208 F. Supp. 2d at 1117 (collecting cases).

Plaintiff argues that she was similarly situated to Novak because they were both on the same level of the organizational chart as vice presidents. Defendants argue that plaintiff and Novak performed different job functions and were not similarly situated employees.[5]

Plaintiff managed the claims department. Her duties involved claims handling, managing employees and working with lawyers to handle claims against insured customers. (Doc. # 197-4). Novak was a consultant and salesman. His responsibilities included offering billable services to state-run workers compensation funds, marketing these services, and soliciting and developing reinsurance brokerage business relationships. (Doc. # 214-2). Both employees had "vice president" in front of their title, but they did not have similar jobs. The differences in duties between plaintiff and Novak do not raise a triable issue of fact as to whether the employees were similarly situated in all material respects.

Plaintiff has not met her initial burden because she does not provide evidence to support an inference that a similarly situated individual received more favorable wage treatment than her. Plaintiff's failure to establish a prima facie case of discrimination merits summary judgment for defendants on plaintiff's gender-based discrimination claims. *See Kortan v. Cal. Youth Authority*, 217 F.3d 1104, 1113 (9th Cir. 2000).

### 2. Retaliation

Under Title VII, "it is unlawful to retaliate against an employee because she has taken action to enforce rights protected under Title VII." *Miller v. Fairchild*, 797 F.2d 727, 730 (9th Cir.

---

[5] Plaintiff's objections to the declarations of Schaffran, Novak, and O'Brien, (docs. ## 219, 220), are without merit. Plaintiff's wage-based discrimination claims focused on the argument that Novak was similarly situated to her and received more favorable compensation. Novak, Schaffran and O'Brien were all listed in defendants' disclosure of persons during discovery. Plaintiff had ample opportunity to depose Novak to determine whether the employees were similarly situated. Plaintiff also had reason to know from Schaffran and O'Brien's job titles and from their depositions that they had knowledge of Trean's corporate structure, including the duties of plaintiff and of Novak. Further, the request for sanctions related to attorney's fees in plaintiff's objection is not properly before this court. *See* Fed. R. Civ. P. 11(c)(2).

James C. Mahan
U.S. District Judge

1   1986). To establish a prima facie case for retaliation, a plaintiff must demonstrate (1) a protected

2   activity; (2) an adverse employment action; and (3) a causal link between the protected activity

3   and the adverse employment action. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034-

4   35 (9th Cir. 2006).

5                   *i.*     *Protected activity*

6   As an initial matter, defendants assert that plaintiff's numerous complaints to Schaffran

7   about Wallace's conduct, including his receipt of pornography, are not a protected activity.

8   Defendants describe plaintiff's comments as mere expressions of personal disapproval.

9   This argument is unconvincing, as even an informal complaint to a supervisor is protected

10  under the anti-retaliation provision of Title VII. *Ray v. Henderson,* 217 F.3d 1234, 1240 n. 3 (citing

11  *Equal Employment Opportunity Commission v. Hacienda Hotel,* 881 F.2d 1504, 1514 (9th Cir.

12  1989)).

13                  *ii.*    *Adverse employment action*

14  A plaintiff may seek relief for both discrete acts of retaliatory adverse employment

15  actionsor for retaliatory harassment that amounts to a hostile work environment. *Hale v. Hawaii*

16  *Publications, Inc.*, 468 F. Supp. 2d 1210, 1222 (D. Haw. 2006) (citing *Ray,* 217 F.3d at1244-45

17  (9th Cir.2000)).

18  Here, plaintiff claims three examples of retaliatory conduct: (1) the second set of customer

19  satisfaction surveys issued in 2010; (2) the Benchmark audits; and (3) O'Brien's cancellation of

20  his meeting with plaintiff in August 2010 along with his alleged hostility towards plaintiff and his

21  withdrawal of management support.

22  Most of these claims are best analyzed as discrete instances of adverse employment actions.

23  However, plaintiff frames all the conduct as retaliatory harassment. The court will therefore

24  analyze the conduct as both.

25                  *a.  Discrete Acts*

26  In regards to adverse employment actions, Title VII "protects an individual not from all

27  retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry.*

28  *Co. v. White*, 548 U.S. 53, 67 (2006). "[O]nly non-trivial employment actions that would deter

**James C. Mahan**
**U.S. District Judge**

reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000). The Supreme Court has clarified that an adverse action, for the purposes of a retaliation claim, must be "materially adverse" such that it is likely to dissuade a reasonable employee from making or support a charge of discrimination. *White,* 548 U.S. at 67–68.

"The adversity of an employment action is judged objectively" and "not everything that makes an employee unhappy is adverse action." *Vasquez v. Cnty. of Los Angeles,* 307 F.3d 884, 890 (9th Cir. 2002). *Compare Hellman v. Weisberg*, 360 F. App'x 776, 778 (9th Cir. 2009) (finding that social ostracism and a threat of termination did not constitute adverse employment actions), *and Sillars v. Nevada*, 385 F. App'x 669, 671 (9th Cir. 2010) (allegations of being treated less kindly and moving an employee to a different work team with no material difference in duties were not adverse employment actions), *with Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1169 (9th Cir. 2014) (finding triable issue when employer stripped plaintiff of a supplemental teaching assignment, made her travel for work using unpaid leave, and rescinded approved vacation).

Here, plaintiff fails to establish that defendants' actions constituted adverse employment actions, because she has failed to identify a harm that resulted from these actions. In regards to the customer satisfaction surveys of plaintiff's division, she readily admits that the results were positive and even complimented plaintiff by name. While plaintiff illustrates this fact to assert that the surveys were not necessary and merely undertaken for a retaliatory purpose, the results demonstrate that the action was not harmful or materially adverse.

Similarly, plaintiff identifies no harm resulting from the 2010 Benchmark audits. While she cites the unorthodox nature of the audits—being conducted internally rather than by an external company—along with a temporary interference in her productivity, these actions cannot be considered materially adverse.

Finally, there is no evidence that any decline in a professional relationship between plaintiff and O'Brien amounted to an adverse employment action. One missed meeting cannot be considered materially adverse, especially considering that O'Brien was only in Las Vegas for a brief period and did not know the nature of the meeting. (*See* doc. # 205 pp. 23-24).

James C. Mahan
U.S. District Judge

1   Plaintiff asserts that this discrete act of missing a meeting is indicative of a general

2   deterioration and growing hostility in their working relationship. She generally cites O'Brien's

3   excluding her from important claims matters arising out of a scandal involving a Las Vegas

4   endoscopy clinic. However, plaintiff provides no evidence of what kind of decisions or specific

5   matters O'Brien allegedly excluded her from beyond vague assertions. Furthermore, she provides

6   no additional evidence of the deterioration in working relationship she alludes to, how her working

7   relationship with O'Brien was affected by the missed meeting, or how the missed meeting

8   materially affected her. Even taken as true, this diminished working relationship would be in line

9   with the type of social ostracism that the Ninth Circuit has not found actionable. *See Hellman*, 360

10  F. App'x at 778; *Sillars*, 385 F. App'x at 671.

11  Accordingly, the court finds that none of the discrete acts that plaintiff cites can be

12  considered adverse employment actions.

13  *b.   Hostile work environment*

14  Plaintiff asserts that the working conditions that resulted from her complaints regarding

15  Wallace's conduct amounted to a hostile work environment. While plaintiffs typically allege a

16  hostile work environment as a stand-alone claim, the Ninth Circuit has found that such working

17  conditions can amount to an adverse employment action. *See* Ray, 217 F.3d at 1245 ("Harassment

18  as retaliation for engaging in protected activity should be no different [than harassment based on

19  race or gender]-it is the paradigm of 'adverse treatment that is based on retaliatory motive and is

20  reasonably likely to deter the charging party or others from engaging in protected activity.' ")

21  (citing EEOC Compliance Manual ¶ 8008).

22  While the text of Title VII refers to discrimination against employees in regards to

23  employment practices such as pay, the law also prohibits sexual harassment when it amounts to a

24  hostile work environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).

25  In order establish a hostile work environment claim, plaintiff must demonstrate that the

26  "workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently

27  severe or pervasive to alter the conditions of the victim's employment and create an abusive

28

James C. Mahan
U.S. District Judge

- 16 -

1  working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (citations and

2  quotations omitted).

3        "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive

4  work environment—an environment that a reasonable person would find hostile or abusive—is

5  beyond Title VII's purview." *Id*. The "mere utterance of an . . . epithet which engenders offensive

6  feelings in a[n] employee does not sufficiently affect the conditions of employment to implicate

7  Title VII." *Id*. (quoting *Meritor*, 477 U.S. at 67) (internal citations and quotation marks omitted).

8        Instead, courts look to the totality of the circumstances, including the "frequency of the

9  discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

10  offensive utterance; and whether it unreasonably interferes with an employee's work

11  performance." *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) (quoting *Harris*, 510 U.S. at

12  23); *see*, *e.g.*, *Ray*, 217 F.3d at 1245 (reversing summary judgment for a retaliatory harassment

13  claim when employers falsely accused the plaintiff of misconduct; "regularly" yelled at him; and

14  "called him a 'liar,' a 'troublemaker,' and a 'rabble rouser,' and told him to 'shut up' ").

15        Here, the same conduct discussed in regards to discrete acts of severe or pervasive

16  harassment, even taken as a whole, cannot be considered either severe or pervasive. While plaintiff

17  undoubtedly found measures such as the satisfaction surveys and the audit irksome, these actions

18  do not align with the type of threatening or humiliating conduct that is actionable under Title VII.

19  Furthermore, plaintiff fails to provide any evidence that the alleged change in working

20  environment interfered with her work performance, beyond the temporary loss in productivity

21  related to the Benchmark audits. Finally, the incidents she indicates cannot be considered

22  pervasive, because they are three discrete incidents spread across 2010.

23        The court finds that none of the conduct that plaintiff identifies as harassment is actionable

24  under Title VII. Plaintiff has failed to establish that she endured an adverse employment action,

25  and a causation analysis is therefore unnecessary. Accordingly, the court grants defendants'

26  motion for summary judgment on plaintiff's retaliation claim.

27  . . .

28  . . .

**James C. Mahan**
**U.S. District Judge**

1    **IV. Conclusion**

2          Accordingly,

3          IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendants' motion for

4    leave to supplement the record, (doc. # 241), be, and the same hereby is, GRANTED.

5          IT IS FURTHER ORDERED that defendants' motion for summary judgment, (doc. #197),

6    be, and the same hereby is, GRANTED.

7          IT IS FURTHER ORDERED that plaintiff's motion for partial summary judgment, (doc.

8    # 200), be, and the same hereby is, DENIED.

9          The clerk shall enter judgment accordingly and close the case.

10         DATED June 24, 2015.

11

12                                           _____
                                            UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**James C. Mahan**
**U.S. District Judge**